IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

| | |
|---|---|
| RONALD K. HOOKS, Regional Director of Region 26 of the National Labor Relations Board, for and on behalf of the NATIONAL LABOR RELATIONS BOARD, )<br><br>Petitioner, )<br><br>v. )<br><br>OZBURN-HESSEY LOGISTICS, LLC, )<br><br>Respondent. ) | No. 10-2609 |

---

## ORDER GRANTING PETITION FOR TEMPORARY INJUNCTION

---

Before the Court is the August 18, 2010 Petition for Temporary Injunction ("Petition") filed by Petitioner Ronald K. Hooks, Regional Director of Region 26 of the National Labor Relations Board, for and on behalf of the National Labor Relations Board ("Petitioner"). (Pet. for Temporary Inj. Under Section 10(j) of the National Labor Relations Act, ECF No. 1.) ("Pet.") On August 31, 2010, this Court granted Petitioner's Motion to Hear Petition for Temporary Injunction on the Administrative Record and Affidavits. (Order 5, ECF No. 11.)

Respondent Ozburn-Hessey Logistics, LLC ("OHL") filed an answer to the Petition on September 3, 2010, and a memorandum in opposition to the Petition on October 4, 2010. (Respondent's

Answer to Pet., ECF No. 13; Respondent's Mem. in Opp'n to Temporary Injunctive Relief Under Section 10(j) of the National Labor Relations Act, ECF No. 25 ("OHL Mem.").) Petitioner filed an amended memorandum in support of the Petition on September 10, 2010, and a reply brief on October 26, 2010. (Am. Mem., ECF No. 18 ("Petitioner's Am. Mem."); Petitioner's Reply Br., ECF No. 33.) OHL filed a sur-reply brief on November 8, 2010. (Respondent's Sur-Reply Br., ECF No. 38.) ("OHL Sur-Reply")

On January 6, 2011, Petitioner filed a letter notifying the Court that Administrative Law Judge John H. West ("ALJ West") had issued a decision and recommended order in an administrative proceeding between Petitioner and OHL, and attached that decision to the letter. (Letter, ECF No. 39; Decision, December 27, 2010, ECF No. 39-1 ("ALJ West Decision").) OHL responded to the letter on January 14, 2011, and filed supplemental documents in support of its response on January 28, 2011. (Resp't Ozburn-Hessey Logistics, LLC's Resp. to Petitioner's Communication with the Court, ECF No. 40 ("OHL Resp. to Letter"); Respondent's Notice of Filing, ECF No. 41.)

For the following reasons, the Petition is GRANTED. Petitioner's request that the Court order OHL to appear before the Court and show cause why an injunction should not issue is DENIED AS MOOT.

## I.   Factual Background[1]

OHL operates three warehouses in Memphis from which it provides logistical support to multiple national retailers. (Ex. N, at 2, May 20, 2010, ECF No. 1-2.) ("ALJ Carson Decision")  In early May 2009, union organizational activity began at OHL.  (Id. at 2-3.)  On September 25, 2009, the United Steelworkers Union (the "Union") filed an election petition seeking to represent OHL's employees. (Ex. H, at 1, ECF No. 1-2; Ex. L, at 1, ECF No. 1-2.)  An election was ultimately held on March 16, 2010 at which, of approximately 317 eligible voters, 119 votes were cast in favor of the Union and 180 votes were cast against the Union. (See Ex. L at 1; ALJ West Decision 1, 93.)

Administrative Law Judge George Carson II ("ALJ Carson") and ALJ West found that OHL had committed numerous violations of

---

[1] The facts discussed in this Part derive from the administrative record and affidavits filed with this Court.  Many of the facts are disputed.  Because "fact-finding is inappropriate in the context of a district court's consideration of a 10(j) [29 U.S.C. § 160(j)] petition," the Court "need not resolve conflicting evidence between the parties" or make credibility determinations.  Ahearn v. Jackson Hosp. Corp., 351 F.3d 226, 237 (6th Cir. 2003) (citations omitted).  The Court need only identify evidence presented by Petitioner to the extent necessary to determine whether Petitioner has "present[ed] enough evidence in support of its coherent legal theory to permit a rational factfinder, considering the evidence in the light most favorable to the [National Labor Relations] Board, to rule in favor of the [National Labor Relations] Board" and whether a temporary injunction would be "just and proper."  Glasser ex rel. NLRB v. ADT Sec. Servs., Inc., 379 F. App'x 483, 486 (6th Cir. 2010) (quoting Arlook ex rel. NLRB v. S. Lichtenberg & Co., 952 F.2d 367, 371 (11th Cir. 1992)); see Schaub v. W. Mich. Plumbing & Heating, Inc., 250 F.3d 962, 969 (6th Cir. 2001) ("[S]o long as facts exist which could support the Board's theory of liability, the district court's findings cannot be clearly erroneous.").  In doing so, the Court does not identify conflicting evidence or resolve factual disputes.

the National Labor Relations Act ("NLRA"), 29 U.S.C. §§ 151 et seq., before the election to discourage employees from supporting the Union.   (See ALJ Carson Decision 35; ALJ West Decision 92-93.)   ALJ West found that OHL's conduct warranted setting aside the election results.   (See ALJ West Decision 93.) OHL has filed exceptions to ALJ Carson's and ALJ West's decisions with the National Labor Relations Board ("Board" or "NLRB").   (See Ex. O, ECF No. 1-2; Respondent's Exceptions to the Decision of the Administrative Law Judge, ECF No. 41-1.) Those appeals are now pending.   Petitioner requests an injunction seeking, among other things, for this Court to order OHL to cease and desist from committing unfair labor practices in violation of the NLRA and to reinstate employees allegedly discharged for supporting the Union pending the final disposition of OHL's appeals by the Board.   (See Pet. 1, 11-15; Petitioner's Am. Mem. 1.)

The hearing before ALJ Carson addressed instances of alleged unfair labor practices.   After union organizational activity began, OHL managers made comments and performed actions expressing animosity toward unionization and threatening employees with reprisals if they supported the Union.   Area Manager Phil Smith told employees in July 2009 that they would not be eligible for the gain share program, which included a bonus, and would lose other benefits, such as meals, cups, and

T-shirts, if a union represented the employees. (See ALJ Carson Decision 3-4; Ex. P, at 203-04, 222-23, 903, ECF No. 19.)  On October 15 and October 16, he confiscated and destroyed pro-union literature on tables in an employee break room before the employees' break periods had ended. (See ALJ Carson Decision 6-7; Ex. P, at 524-26, 541-44, 550-52.)  During that period, he once shouted the name of an employee who had placed pro-union literature on the tables, held the literature over his head, tore apart the literature, and yelled, "Not in my warehouse" in front of a group of employees. (See Ex. P, at 550-52.)

In June 2009, Human Resources Manager Evangelia (Van) Young called employee Undenise Martin at home and asked her whether she had "heard anything about the Union activities" and why the employees were interested in unionizing. (See ALJ Carson Decision 8; Ex. P, at 894-97.)  On August 31, Van Young called the police to have two union organizers distributing pro-union literature to employees removed from public property, falsely claiming they were trespassing on private property. (See ALJ Carson Decision 9-10; Ex. P, at 568-82.)  In October, she told employees at a group meeting that they would lose their jobs if they participated in an economic strike. (See ALJ Carson Decision 10-11; Ex. P, at 440-46, 992.)  At that meeting, she also said that, if OHL bargained with a union, OHL would reject

its proposals and leave employees without a contract for years. (<u>See</u> ALJ Carson Decision 11; Ex. P, at 473-78.)

On September 18, Area Manager Kelvin Davis told employees that they could not distribute pro-union literature to employees in non-working areas on non-working time and ordered them to leave OHL's property. (<u>See</u> ALJ Carson Decision 11-13; Ex. P, at 139-52, 582-91.) On September 25, Operations Manager Roy Ewing ordered Carolyn Jones, who was distributing pro-union literature and discussing the Union with co-workers on break, to leave the premises. (<u>See</u> ALJ Carson Decision 13-15; Ex. P, at 154-56.) After Carolyn Jones left, he asked employees what had been said, whether the employees had accepted pro-union literature, and if they had understood what they had been told. (<u>See</u> ALJ Carson Decision 15; Ex. P, at 428-29, 458.)

In a weekly report for the week ending August 17, 2009, Van Young discussed "presumed union activity" and reported that Carolyn Jones and Jerry Smith "are presumed the chairs of this drive." (ALJ Carson Decision 16; Ex. 92, at 1, ECF No. 19-3.) On August 27, 2009, Van Young stated in an email that Renal Dotson "is one of the real disruptive individual[s] that [are] working hand in hand with the crew that is trying to drive a union into OHL Memphis." (ALJ Carson Decision 16; Ex. 81, at 1, ECF No. 19-3.) On August 28, Renal Dotson and Jerry Smith were

terminated, and Carolyn Jones was suspended for five days. (See ALJ Carson Decision 16.)

Renal Dotson received a warning on August 4 for performing unauthorized work during overtime when asked for assistance despite a standing order from a supervisor to perform the assistance triggering the warning. (See ALJ Carson Decision 24; Ex. P, at 297-312.) OHL issued the warning without an investigation. (See ALJ Carson Decision 24.) At the hearing before ALJ Carson, OHL presented no evidence of another employee receiving discipline for performing unauthorized work during overtime when asked for assistance. (See id.) On August 26, Area Manager Phil Smith asked Renal Dotson, "Why you here with this company?  Why you working for this company?  Why don't you go down Holmes Road somewhere and find a new job?" (Ex. P, at 326; see ALJ Carson Decision 22, 25.) On August 28, Renal Dotson was terminated, purportedly for missing a pre-shift meeting, despite OHL's routinely tolerating such conduct by other employees without disciplining them. (See ALJ Carson Decision 25-26; Ex. P, at 332-35.) At the hearing before ALJ Carson, OHL presented no evidence that any employee had been disciplined before August 28 for missing a pre-shift meeting. (See ALJ Carson Decision 25.)

Carolyn Jones was issued a warning on August 28 for refusing to follow a supervisor's instruction to go to the back

of the metal detector line after an alarm went off although she followed the instruction. (See id. at 26-29; Ex. P, at 119-28.) At the hearing before ALJ Carson, OHL presented no evidence that any employee other than Carolyn Jones had been disciplined for an incident at the metal detectors. (See ALJ Carson Decision 28.) After Carolyn Jones protested that the discipline was unfair, remarking that her supervisors were ganging up on her and accusing them of trying to do to her the same thing they had done to Renal Dotson, she was suspended for five days for being disrespectful, despite OHL's having tolerated another employee calling a supervisor a "damned liar" in a pay dispute. (See id. at 28-30; Ex. P, at 120-37, 280-81.)

Jerry Smith was terminated on August 28. (See ALJ Carson Decision 30; Ex. P, at 212.) After Carolyn Jones had left the office after her first meeting with her supervisors that day, Jerry Smith, her boyfriend, was standing outside the fence surrounding the work area and saw two supervisors pass her and appear to say something within the area surrounded by the fence. (See ALJ Carson Decision 30; Ex. P, at 227-28.) Jerry Smith then saw Carolyn Jones start to cry. (See ALJ Carson Decision 30; Ex. P, at 131, 227-28.) To be heard over the noise in the warehouse, he yelled from outside the fence, "What's the problem?" (See ALJ Carson Decision 30-31; Ex. P, at 131, 228.) Area Manager Phil Smith heard Jerry Smith from within the area

8

surrounded by the fence, walked quickly toward the fence, and told Jerry Smith, "You better be talking to her. Because if you're talking to me me [sic], you're going to have a problem." (Ex. P, at 228.) Jerry Smith then said, "I was talking to both of you." (Id.) Throughout the exchange, Area Manager Phil Smith and Jerry Smith were about seven or eight feet apart and separated by the fence. (See id. at 228-230.) A security guard who was on duty nearby sat at her desk throughout the exchange and said nothing. (See id.) Carolyn Jones and Jerry Smith then left for lunch. (See ALJ Carson Decision 31; Ex. P, at 228.) When they returned, Jerry Smith was terminated. (See ALJ Carson Decision 32; Ex. P, at 234-35.) The purported reason for his termination was that Area Manager Phil Smith felt threatened by Jerry Smith's saying, "What's the problem?" from outside the fence. (See ALJ Carson Decision 32; Ex. P, at 234-35.)

Approximately one year before the incident between Jerry Smith and Area Manager Phil Smith, employee Dwight Beard walked to within twelve inches of Area Manager Phil Smith during a pay dispute, called Area Manager Phil Smith a "damned liar," removed his glasses, and said he "was going to get my money." (See ALJ Carson Decision 32; Ex. P, at 280-82.) In response, Area Manager Phil Smith said, "You want to make me get ghetto with you. We can take this outside." (See ALJ Carson Decision 32; Ex. P, at 280, 284.) After that incident, Dwight Beard received

a warning that he tore up in front of two supervisors. (See ALJ Carson Decision 32; Ex. P, at 283.)   That warning was not reissued, and Dwight Beard continued working at OHL. (See ALJ Carson Decision 32; Ex. P, at 283.)   In fact, at the pre-shift meeting the next day, Area Manager Phil Smith apologized to Dwight Beard and shook hands with him. (See ALJ Carson Decision 32; Ex. P, at 284.)   Area Manager Phil Smith claimed during the hearing before ALJ Carson that he had not felt threatened by Dwight Beard's conduct. (See ALJ Carson Decision 32; Ex. P, at 1261.)

The hearing before ALJ West addressed other instances of alleged unfair labor practices.   On November 8, 2009, Human Resources Manager Van Young questioned employee Helen Herron, who was not an open union supporter, about the union activities of employees Glenora Rayford and Nichole Bledsoe. (See ALJ West Decision 3, 54-56; Hr'g Tr. 126-27, July 14, 2010, ECF No. 26-1.)   On November 10, 2009, Van Young called employee Glenora Rayford, who was not an open union supporter, to her office and asked Rayford if she supported the Union. (See ALJ West Decision 57; Hr'g Tr. 288, July 15, 2010, ECF No. 26-2.)   At that meeting, Van Young also attempted to obtain information about whether Rayford's daughter, employee Nichole Bledsoe, supported the Union. (See ALJ West Decision 3, 57; Tr. 287-88, July 15, 2010.)   Young also asked Rayford to speak with Bledsoe

10

and convince Bledsoe to abandon her support for the Union. (See ALJ West Decision 57; Tr. 288, July 15, 2010.) After that meeting, Young and Rayford left the office together and, on approaching Vice President Karen White's office, White asked Rayford if Bledsoe, Rayford's daughter, would listen to her request to abandon support for the Union. (See ALJ West Decision 3, 58; Tr. 289-90, July 15, 2010.) Young then told White that Rayford "could get through" to Bledsoe, to which White responded, "Okay, Glenora [Rayford]." (See ALJ West Decision 58; Tr. 290, July 15, 2010.)

On November 17, 2009, Rayford received a telephone call from Roy Ewing, the manager of the Remington Department, where Rayford had regularly worked two hours of overtime on an as-needed basis since May 2009. (See ALJ West Decision 58-59; Tr. 295-300, 309-10, July 15, 2010.) During that call, Ewing told Rayford that he did not want her to work the next day at the Remington Department because "he didn't want this Union shit down in here." (See ALJ West Decision 58-59; Tr. 314, July 15, 2010.) Ewing then asked Rayford, "Are you for the Union?" (See Tr. 314, July 15, 2010.) Rayford testified that her conversation with Ewing ended with the following exchange:

> And [Ewing] told me that, if the conversation get back out in the warehouse, I'm not going to like it. They going to be some repercussion and I'm not going to like the outcome of it. And this conversation is over. He said, "I don't want you at Remington. If I

need you to work overtime," he said, "I will give you a call."

(Id. at 315.)  As of July 15, 2010, Rayford had not worked overtime at the Remington Department since receiving Ewing's call.  (See id.)

At 9:30 a.m. on March 1, 2010, Manager Buddy Lowery told employee Glorina Kurtycz, "You are on my list" and asked her what she thought about the Union.  (See ALJ West Decision 59-60; Tr. 171-72, July 14, 2010.)  Kurtycz told Lowery that she supported the Union and complained about working conditions as Lowery took notes.  (See ALJ West Decision 59-60; Tr. 171-72, July 14, 2010.)  Around 2:00 p.m. the same day, Manager Vania Washington called Kurtycz to her office and accused her of handing out pro-union literature inside the warehouse and forcing employees to sign union cards.  (See ALJ West Decision 68; Tr. 173-74, 181-82, July 14, 2010.)  Although Kurtycz denied the accusations, she was sent home and was told to call the next day.  (See Tr. 174-75, July 14, 2010.)  After clocking out at 2:45 p.m., Kurtycz saw Jerry Smith distributing pro-union flyers outside OHL's facility and joined him.  (See ALJ West Decision 68; Tr. 174-76, 182, July 14, 2010.)  Before then, Kurtycz had never distributed pro-union flyers.  (See Tr. 174-76, July 14, 2010.)  Area Manger Phil Smith saw her distributing flyers. (See id. at 176-77.)  The next day, Kurtycz was terminated for

purportedly violating OHL's non-solicitation policy although she did not do so.  (See ALJ West Decision 68; Tr. 173-78, July 14, 2010.)

## II.  Jurisdiction

Under Section 10(j) of the NLRA, 29 U.S.C. § 160(j), this Court has jurisdiction over Petitioner's request for a temporary injunction pending the Board's resolution of the underlying unfair labor practice proceedings.  See 29 U.S.C. § 160(j); W. Mich. Plumbing & Heating, 250 F.3d at 969; Frye v. Dist. 1199, Health Care & Soc. Servs. Union, 996 F.2d 141, 143-44 (6th Cir. 1993) (per curiam).  It also has subject-matter jurisdiction under 28 U.S.C. § 1331 and 28 U.S.C. § 1345.  See 28 U.S.C. § 1331; 28 U.S.C. § 1345; Glasser ex rel. NLRB v. Heartland-Univ. of Livonia, 632 F. Supp. 2d 659, 662 (E.D. Mich. 2009).

## III. Standard of Review

In deciding whether to grant a Section 10(j) injunction, this Court employs the "'reasonable cause/just and proper' standard" employed by the Sixth Circuit Court of Appeals and district courts of this circuit.  Ahearn, 351 F.3d at 234; accord W. Mich. Plumbing & Heating, 250 F.3d at 969; Heartland-Univ. of Livonia, 632 F. Supp. 2d at 665.  "Specifically, the 'reasonable cause/just and proper' standard requires that a district court find that (1) there is 'reasonable cause' to believe that unfair labor practices have occurred, and that (2)

injunctive relief with respect to such practices would be 'just and proper.'" Ahearn, 351 F.3d at 234 (quoting W. Mich. Plumbing & Heating, 250 F.3d at 969); accord Fleischut v. Nixon Detroit Diesel, Inc., 859 F.2d 26, 29 (6th Cir. 1988) (citation omitted); Heartland-Univ. of Livonia, 632 F. Supp. 2d at 665. This Court must make both findings before issuing a § 10(j) injunction. See ADT Sec. Servs., Inc., 379 F. App'x at 485 (citing Ahearn, 351 F.3d at 234); Heartland-Univ. of Livonia, 632 F. Supp. 2d at 665.

As required by the Sixth Circuit, "[p]roceedings pursuant to § 10(j) are subordinate to the unfair labor practice proceedings to be heard before the Board." Ahearn, 351 F.3d at 237 (quoting W. Mich. Plumbing & Heating, 250 F.3d at 969). This Court must not adjudicate the merits of the underlying unfair labor practice charges. Id. (quoting W. Mich. Plumbing & Heating, 250 F.3d at 969).

OHL argues that this Court should apply traditional equitable criteria in its analysis of the "just and proper" element as a matter of first impression. (See OHL Mem. 7-8; OHL Sur-Reply 1-2.) To support that argument, OHL cites Schaub v. Detroit Newspaper Agency, 154 F.3d 276 (6th Cir. 1998), a Sixth Circuit case stating in dicta, "Counsel for the Board acknowledged at oral argument that the caselaw in this circuit does not flatly foreclose consideration of equitable factors

such as this in § 10(j) cases, and we agree that it does not."
Detroit Newspaper Agency, 154 F.3d at 280.   In response,
Petitioner argues that this Court should not consider
traditional equitable criteria in light of Ahearn, a subsequent
Sixth Circuit case.  (See Petitioner's Reply Br. 2-3.)

In Ahearn, the court rejected an employer's argument that
it should replace the "reasonable cause/just and proper"
standard in § 10(j) cases with the traditional equitable
criteria used to decide petitions for injunctions.  See Ahearn,
351 F.3d at 234-36.   The court concluded that the "reasonable
cause/just and proper standard" was supported by longstanding
Sixth Circuit precedent that the panel could not overrule and
that the standard properly considered the employer hospital's
special interests in maintaining a safe environment and optimal
patient care.  See id.

Although OHL argues that Ahearn decided only that
traditional equitable criteria could not replace the "reasonable
cause/just and proper" standard and left open whether district
courts could consider traditional equitable criteria under the
"just and proper" element, Ahearn decided more.   Ahearn
distinguished a case in which the Eighth Circuit Court of
Appeals adopted the approach OHL seeks here.  See id. at 236;
see also Sharp v. Parents in Cmty. Action, Inc., 172 F.3d 1034,
1038 (8th Cir. 1999) (concluding that the reference to "just and

proper" in § 10(j) incorporates traditional equitable principles). Ahearn included Sharp in a citation as support for the proposition that "a number of circuits have overhauled the 'reasonable cause/just and proper' standard, instead adopting the 'traditional' test." Ahearn, 351 F.3d at 236. Contrasting that approach with other circuits that have retained the "reasonable cause/just and proper" standard, the Sixth Circuit stated that it would continue to follow the approach taken by those circuits. See id.

The Sixth Circuit recently applied the "reasonable cause/just and proper" standard in reviewing a § 10(j) injunction decision by a district court without consideration of equitable criteria. See ADT Sec. Servs., Inc., 379 F. App'x at 485-86. In that case, the court distinguished its approach from circuits that have incorporated the traditional equitable criteria for injunctions into the "just and proper" element. See id. at 485 n.2; cf. Kobell ex rel. NLRB v. United Paperworkers Int'l Union, 965 F.2d 1401, 1409 n.3 (6th Cir. 1992) ("In section 10(j), Congress authorized injunctive relief upon a showing that such relief is just and proper and not upon the traditional, more stringent requirement of irreparable harm.") (citation omitted). Therefore, this Court will apply the "reasonable cause/just and proper" standard to Petitioner's

injunction request without consideration of traditional equitable criteria.

### IV.  Analysis

Petitioner argues that there is "reasonable cause" to believe that OHL has violated the NLRA and that temporary injunctive relief is "just and proper."  (<u>See</u> Petitioner's Am. Mem. 5-20; Petitioner's Reply Br. 1-12; Letter 1-2.)  OHL argues that neither element is satisfied.  (<u>See</u> OHL Mem. 8-18; OHL Sur-Reply 2-6; OHL Resp. to Letter 3-8.)

### A.  Reasonable Cause

"Petitioner's burden of showing 'reasonable cause' is 'relatively insubstantial,' inasmuch as the proof requires only that the Board's legal theory underlying the allegations of unfair labor practices be 'substantial and not frivolous' and that the facts of the case be consistent with the Board's legal theory."  <u>Ahearn</u>, 351 F.3d at 237 (quoting <u>W. Mich. Plumbing & Heating</u>, 250 F.3d at 969).  Put differently, "[Petitioner] must present enough evidence in support of its coherent legal theory to permit a rational factfinder, considering the evidence in the light most favorable to [Petitioner], to rule in favor of [Petitioner]."  <u>ADT Sec. Servs., Inc.</u>, 379 F. App'x at 486 (quoting <u>S. Lichtenberg & Co.</u>, 952 F.2d at 371).

To satisfy the requirement that its legal theory be "substantial and not frivolous," Petitioner need not prove a

violation of the NLRA or convince this Court of the validity of the Board's theory of liability.   See W. Mich. Plumbing & Heating, 250 F.3d at 969.   In deciding whether Petitioner satisfies the second requirement, that the facts of the case be consistent with the Board's legal theory, this Court "need not resolve conflicting evidence between the parties" or make credibility determinations.  Ahearn, 351 F.3d at 237 (quoting W. Mich. Plumbing & Heating, 250 F.3d at 969).   Indeed, fact-finding is inappropriate.   Id. (citation omitted).   Petitioner "must only produce some evidence in support of the petition." Gottfried ex rel. NLRB v. Frankel, 818 F.2d 485, 493 (6th Cir. 1987).

This Court may consider direct and circumstantial evidence to determine OHL's motive in undertaking the challenged conduct. Ahearn, 351 F.3d at 237 (quoting W. Mich. Plumbing & Heating, 250 F.3d at 970).   For instance, proximity in time between protected activity and measures taken against an employee who engaged in that activity support an inference that OHL committed an unfair labor practice.   Id. (quoting W. Mich. Plumbing & Heating, 250 F.3d at 970).

Petitioner argues that OHL's actions after union activity had begun violated sections 8(a)(1) and 8(a)(3) of the NLRA.[2]

---

[2]   In the Petition and the amended memorandum in support of the Petition, Petitioner argues that OHL violated sections 8(a)(3) and 8(a)(4) of the NLRA by disciplining employee Jennifer Smith for testifying before ALJ Carson.

(Petitioner's Am. Mem. 5-13, 15.)   Under Section 8(a)(3), an employer commits an unfair labor practice "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization."  29 U.S.C. § 158(a)(3); accord Temp-Masters, Inc. v. NLRB, 460 F.3d 684, 689 (6th Cir. 2006).   "A violation of Section 8(a)(3) of the [NLRA] produces a derivative violation of Section 8(a)(1)."  Temp-Masters, 460 F.3d at 689 (citing Metro. Edison Co. v. NLRB, 460 U.S. 693, 698 n.4 (1983)); accord NLRB v. Consol. Biscuit Co., 301 F. App'x 411, 422 (6th Cir. 2008) (citations omitted).

Under Section 8(a)(1), an employer commits an unfair labor practice by "interfer[ing] with, restrain[ing], or coerc[ing] employees in the exercise of the rights guaranteed in section [7]."  29 U.S.C. § 158(a)(1); accord Temp-Masters, 460 F.3d at 689.   Section 7 guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the

_____

(Pet. 1-2, 14; Petitioner's Am. Mem. 14-15.) ALJ West concluded that OHL did not violate the NLRA by disciplining Jennifer Smith.  (See ALJ West Decision 61-63.)   After ALJ West's decision, Petitioner stated in a letter to the Court filed electronically that it no longer sought injunctive relief based on Jennifer Smith's suspension.  (See Letter 1.)   Thus, the Court regards Petitioner's claims based on Smith's suspension as withdrawn.  To the extent not withdrawn, Petitioner has not demonstrated "reasonable cause" for injunctive relief based on those claims for the reasons stated in ALJ West's decision.  (See ALJ West Decision 61-63.)  Because Smith's suspension was the only basis on which Petitioner alleged a section 8(a)(4) violation, no alleged violation of that section remains before the Court.

purpose of collective bargaining or other mutual aid or protection . . . ." 29 U.S.C. § 157; accord Temp-Masters, 460 F.3d at 689. "A section 8(a)(1) violation occurs when substantial evidence demonstrates that the employer's statements, considered from the employees' point of view, had a reasonable tendency to coerce." Dayton Newspapers, Inc. v. NLRB, 402 F.3d 651, 659 (6th Cir. 2005) (citations omitted).

One of Petitioner's legal theories is that statements and conduct by OHL supervisors after union activity had begun violated Section 8(a)(1). (See Petitioner's Am. Mem. 5-6.) Petitioner has offered evidence that Area Manager Phil Smith told employees in July 2009 that they would not be eligible for the gain share program, which included a bonus, and would lose other benefits, such as meals, cups, and T-shirts, if a union represented the employees. (See ALJ Carson Decision 3-4; Ex. P, at 203-04, 222-23, 903.) Petitioner has also offered evidence that, in October, Human Resources Manager Van Young told employees at a group meeting that they would lose their jobs if they participated in an economic strike. (See ALJ Carson Decision 10-11; Ex. P, at 440-46, 992.)

Those facts are consistent with and support Petitioner's legal theory that OHL violated Section 8(a)(1), a theory that is substantial and not frivolous. See Dayton Newspapers, 402 F.3d at 660 ("[T]hreatening employees with loss of employment or

20

other adverse consequences should they strike, or trying to induce employees to rid themselves of the union by promising they would be better off without it are well-established violations of § 8(a)(1).") (citations omitted); V&S ProGalv, Inc. v. NLRB, 168 F.3d 270, 279 (6th Cir. 1999) ("It is well settled that an employer violates § 8(a)(1) of the [NLRA] by threatening to withhold benefits . . . for engaging in union activities.") (citations omitted); see also Consol. Biscuit Co., 301 F. App'x at 433-34 (concluding that substantial evidence supported the conclusion that an employer violated § 8(a)(1) when a supervisor had suggested that employees would probably lose benefits, such as holiday hams and turkeys, if a union represented them); Wilkie Co. v. NLRB, 55 F. App'x 324, 328 (6th Cir. 2003) (concluding that "more than merely substantial evidence" supported the NLRB's conclusion that an employer violated § 8(a)(1) "by telling multiple employees they would lose their job or suffer retaliation if they went on strike"). Therefore, Petitioner has satisfied its burden of showing reasonable cause to believe that OHL violated Section 8(a)(1) by threatening loss of benefits and reprisals if employees unionized or participated in a strike.

Petitioner has offered evidence that Area Manager Phil Smith confiscated and destroyed pro-union literature on tables in an employee break room before the end of employees' break

21

periods on October 15, 2009, and October 16, 2009. (See ALJ Carson Decision 6-7; Ex. P, at 524-26, 542-44, 550-52.) Petitioner has also offered evidence that, on September 18, 2009, Area Manager Kelvin Davis told employees they could not distribute pro-union literature to employees in non-working areas on non-working time and ordered them to leave OHL's property, and, on September 25, 2009, Operations Manager Roy Ewing ordered Carolyn Jones, who was distributing pro-union literature and discussing the Union with co-workers on break, to leave the premises. (See ALJ Carson Decision 11-15; Ex. P, at 139-56, 582-91.)

Those facts are consistent with and support Petitioner's legal theory that OHL violated Section 8(a)(1), a theory that is substantial and not frivolous. See United Parcel Serv., Inc. v. NLRB, 228 F.3d 772, 776, 782 (6th Cir. 2000) (stating that an employer may not stop the distribution of union literature in a non-work area during non-working time and affirming the NLRB's conclusion that an employer violated § 8(a)(1) by prohibiting distribution of union literature in an employee break area during non-working times); Nat'l Steel Corp., Great Lakes Steel Div. v. NLRB, 415 F.2d 1231, 1233 (6th Cir. 1969) ("It is generally recognized that a rule prohibiting employees from distributing union literature on their own time and in non-working areas of the employer's property is presumptively

22

invalid.") (citation omitted); see also Consol. Biscuit Co., 301
F. App'x at 438-39 (concluding that substantial evidence
supported the NLRB's conclusion that an employer violated §
8(a)(1) when a security guard told an employee that she could
not distribute union literature on company property); Meijer,
Inc. v. NLRB, 463 F.3d 534, 545 (6th Cir. 2006) (enforcing NLRB
order prohibiting an employer from banning union solicitation in
its parking lots or promulgating or publishing any such policy);
Consol. Diesel Co. v. NLRB, 263 F.3d 345, 354 (4th Cir. 2001)
("[D]istributing union literature is a core activity protected
by § 7.   Thus, an employer may not confiscate union literature
left for distribution to employees in nonwork areas during
nonwork time.") (citations omitted); Jennie-O Foods, 301
N.L.R.B. 305, 338 (1991) (adopting an administrative law judge's
conclusion that the vice president of an employer violated §
8(a)(1) by destroying pro-union handbills left in employees'
lunchroom while an employee was present in the lunchroom).
Therefore, Petitioner has satisfied its burden of showing
reasonable cause to believe that OHL violated Section 8(a)(1) by
interfering with the distribution of union literature in non-
work areas on employees' non-working time.

Petitioner has offered evidence that Human Resources
Manager Van Young told employees at a group meeting that, if OHL
bargained with a union, OHL would reject its proposals and leave

employees without a contract for years. (See ALJ Carson Decision 11; Ex. P, at 473-78.) As found by ALJ Carson, that conduct conveyed the message that it would be futile for employees to select a union as their collective bargaining representative. (See ALJ Carson Decision 11.) That conduct and message are consistent with and support Petitioner's legal theory that OHL violated Section 8(a)(1), a theory that is substantial and not frivolous. See NLRB v. E.I. DuPont De Nemours, 750 F.2d 524, 527-28 (6th Cir. 1984) ("An employer also violates section 8(a)(1) of the Act by threatening employees with reprisals and with the futility of unionization.") (citations omitted); see also Consol. Biscuit Co., 301 F. App'x at 437 (concluding that the NLRB's conclusion that a supervisor's statement violated the NLRA was supported by substantial evidence where the supervisor told an employee that a union would not change anything); U.S. Elec. Motors v. NLRB, 722 F.2d 315, 317-18, 321-22 (6th Cir. 1983) (per curiam) (enforcing an NLRB decision finding, in part, that an employer violated § 8(a)(1) when a manager communicated to employees that the plant would close if a union represented the employees); NLRB v. Fry Foods, Inc., 609 F.2d 267, 270-71 (6th Cir. 1979) (concluding that "more than substantial evidence" supported the NLRB's conclusion that an employer violated § 8(a)(1) by, among other things, telling employees it would not bargain with the

union even if it won a representation election). Therefore, Petitioner has satisfied its burden of showing reasonable cause to believe that OHL violated Section 8(a)(1) by communicating to employees that unionization would be futile.

Petitioner has offered evidence that OHL on numerous occasions interrogated employees about their support for unionization and union activities. In June 2009, Human Resources Manager Van Young called employee Undenise Martin at home and asked her whether she had "heard anything about the Union activities" and why the employees were interested in unionizing. (See ALJ Carson Decision 8; Ex. P, at 894-97.) On September 25, 2009, Operations Manager Roy Ewing asked employees what Carolyn Jones had told them while distributing pro-union literature, whether the employees had accepted the literature, and if they had understood what they had been told. (See ALJ Carson Decision 13-15; Ex. P, at 428-29, 458.) On November 8, 2009, Human Resources Manager Van Young questioned employee Helen Herron, who was not an open union supporter, about the union activities of employees Glenora Rayford and Nichole Bledsoe. (See ALJ West Decision 3, 54-56; Tr. 126-27, July 14, 2010.) On November 10, 2009, Van Young called employee Glenora Rayford, who was not an open union supporter, to her office and asked Rayford if she supported the Union. (See ALJ West Decision 57; Tr. 288, July 15, 2010.) At that meeting, Van

25

Young also attempted to obtain information about whether Rayford's daughter, employee Nichole Bledsoe, supported the Union. (See ALJ West Decision 3, 57; Tr. 287-88, July 15, 2010.) Vice President Karen White asked Rayford if Bledsoe would listen to Rayford's request to abandon support for the Union. (See ALJ West Decision 3, 58; Tr. 289-90, July 15, 2010.) On November 17, 2009, Rayford received a telephone call from Roy Ewing, the manager of the Remington Department, who asked her, "Are you for the Union?" (See ALJ West Decision 58-59; Tr. 314, July 15, 2010.) At 9:30 a.m. on March 1, 2010, Manager Buddy Lowery asked employee Glorina Kurtycz what she thought about the Union. (See ALJ West Decision 59-60; Tr. 171-72, July 14, 2010.)

Those facts are consistent with and support Petitioner's legal theory that OHL violated Section 8(a)(1), a theory that is substantial and not frivolous, because those interrogations reasonably tended to restrain, coerce, and interfere with the employees' rights under the circumstances. See Ctr. Constr. Co. v. NLRB, 482 F.3d 425, 436 (6th Cir. 2007) ("An employer violates section 8(a)(1) of the NLRA when it interrogates employees about their union activities under circumstances in which the interrogation reasonably tends to restrain, coerce, or interfere with the employees' rights under the NLRA. The Board assesses coerciveness in light of, among other things, the

background, the nature of the information sought, the questioner's identity, and the place and method of interrogation." (citing V&S ProGalv, 168 F.3d at 280)); Wilkie Co., 55 F. App'x at 327 ("An employer also violates Section 8(a)(1) by interrogating employees about their union sympathies or the union sympathies of their co-workers.") (citation omitted); see also E.I. DuPont De Nemours, 750 F.2d at 528 (concluding that substantial evidence supported the NLRB's finding that an employer violated § 8(a)(1) when a supervisor approached and questioned an employee about his reasons for supporting the union). Therefore, Petitioner has satisfied its burden of showing reasonable cause to believe that OHL violated Section 8(a)(1) by interrogating employees about their union activities and support and other employees' union activities and support.

Petitioner has offered evidence that Human Resources Manager Van Young asked Rayford to speak with Bledsoe and convince Bledsoe to abandon her support of the Union. (See ALJ West Decision 57; Tr. 288, July 15, 2010.) That fact is consistent with and supports Petitioner's legal theory that OHL violated Section 8(a)(1), a theory that is substantial and not frivolous. See Med. Ctr. of Ocean Cnty. v. NLRB, No. 95-1043, 1996 WL 590878, at *1 (D.C. Cir. Oct. 7, 1996) (per curiam) (concluding that supervisors violated § 8(a)(1) by soliciting

27

employees to convince other employees to give up the union) (citations omitted); NLRB v. Redwing Carriers, Inc., 586 F.2d 1066, 1067 (5th Cir. 1978) (per curiam) (concluding that substantial evidence supported the NLRB's finding that an employer violated § 8(a)(1) by, among other things, soliciting employees to speak to other employees in opposition to a union). Therefore, Petitioner has satisfied its burden of showing reasonable cause to believe that OHL violated Section 8(a)(1) by requesting that an employee convince another employee, her daughter, to abandon her support of the Union.

Petitioner has offered evidence that, on August 31, 2009, Van Young called the police to have two union organizers distributing pro-union literature to employees removed from public property, falsely claiming they were trespassing on private property. (See ALJ Carson Decision 9-10; Ex. P, at 568-82.) That fact is consistent with and supports Petitioner's legal theory that OHL violated Section 8(a)(1), a theory that is substantial and not frivolous. See Cumberland Farms, Inc. v. NLRB, 984 F.2d 556, 558-59 (1st Cir. 1993) (concluding that an employer violated § 8(a)(1) by threatening to have union organizers who were distributing handbills on public property arrested); Walgreen Co., 352 N.L.R.B. 1188, 1193 (2008) ("The Board has held that calling the police to have union organizers removed from public property violates Section 8(a)(1) of the

28

Act.  By claiming that union agents are trespassing on private property when in fact they are not, and calling the police to eject them when they distributed literature to employees, a respondent violates the Act.") (citations omitted).  Therefore, Petitioner has satisfied its burden of showing reasonable cause to believe that OHL violated Section 8(a)(1) by contacting the police.

Petitioner has offered evidence that that, on August 26, 2009, Area Manager Phil Smith asked Renal Dotson, "Why you here with this company?  Why you working for this company?  Why don't you go down Holmes Road somewhere and find a new job?"  (Ex. P, at 326; see ALJ Carson Decision 22, 25.)  The next day, Van Young stated in an email that Renal Dotson "is one of the real disruptive individual[s] that [are] working hand in hand with the crew that is trying to drive a union into OHL Memphis." (ALJ Carson Decision 16; Ex. 81, at 1.)

Given the substantial evidence suggesting anti-union animus proximate in time to Area Manager Phil Smith's remark and OHL's awareness that Renal Dotson was a leading union supporter, Petitioner has offered evidence that is consistent with and supports its legal theory that OHL violated Section 8(a)(1), a theory that is substantial and not frivolous.  See NLRB v. Almet, Inc., 987 F.2d 445, 451-52 (7th Cir. 1993) (concluding that an employer violated § 8(a)(1) when a foreperson solicited

29

an employee to quit in order to convince him to stop his pro-union activities); Roma Baking Co., 263 N.L.R.B. 24, 30 (1982) (concluding that a suggestion that employees could quit if they were not happy in the context of union activity violates § 8(a)(1)). Therefore, Petitioner has satisfied its burden of showing reasonable cause to believe that OHL violated Section 8(a)(1) by suggesting that Renal Dotson could quit.

Another of Petitioner's legal theories is that OHL violated Section 8(a)(3) by discriminating against Renal Dotson, Carolyn Jones, Jerry Smith, Glorina Kurtycz, and Glenora Rayford in their employment terms or conditions to discourage membership in the Union. (See Petitioner's Am. Mem. 7-13.)

Petitioner has offered evidence that Renal Dotson was issued a warning on August 4, 2009, for performing unauthorized work during overtime when asked for assistance, despite a standing order from a supervisor to perform the assistance triggering the warning. (See ALJ Carson Decision 24; Ex. P, at 297-312.) OHL issued the warning without an investigation. (See ALJ Carson Decision 24.) At the hearing before ALJ Carson, OHL presented no evidence that another employee received discipline for performing unauthorized work during overtime when asked for assistance. (See id.) On August 27, 2009, Van Young stated in an email that Renal Dotson "is one of the real disruptive individual[s] that [are] working hand in hand with

30

the crew that is trying to drive a union into OHL Memphis."
(ALJ Carson Decision 16; Ex. 81, at 1.)  On August 28, 2009,
Renal Dotson was terminated purportedly for missing a pre-shift
meeting, although OHL routinely tolerated such conduct by other
employees without disciplining them.  (See ALJ Carson Decision
25-26; Ex. P, at 331-35.)  At the hearing before ALJ Carson, OHL
presented no evidence that any employee had been disciplined
before August 28, 2009, for missing a pre-shift meeting.  (See
ALJ Carson Decision 25.)

Those facts are consistent with and support Petitioner's
legal theory that OHL violated Section 8(a)(3) by disciplining
and terminating Renal Dotson to discourage support for the
Union.  (See Petitioner's Am. Mem. 7.)  They suggest that OHL
identified Renal Dotson as a leading union supporter, gave him a
written warning without any investigation for following a
supervisor's instruction, and terminated him for conduct it
tolerated from other employees because he was a leading union
supporter.  Given the evidence suggesting that OHL's reasons for
disciplining Rental Dotson were pretextual and that OHL's true
reason for disciplining and terminating him was because he was a
leading supporter of the Union, Petitioner's theory is
substantial and not frivolous.  See Consol. Biscuit Co., 301 F.
App'x at 421-23 (stating that "if the employer fires an employee
for having engaged in union activities and has no other basis

for the discharge, or if the reasons that he proffers are pretextual, the employer commits an unfair labor practice" and concluding that substantial evidence suggested that an employer violated § 8(a)(3) and § 8(a)(1) by giving an employee a warning for discussing unionization with co-workers (quoting W.F. Bolin Co. v. NLRB, 70 F.3d 863, 870 (6th Cir. 1995))); Ahearn, 351 F.3d at 237-38 (stating that district courts may consider direct and circumstantial evidence to determine an employer's motive when undertaking challenged conduct and that "[t]his Court has held that an employer's termination of an employee for engaging in union activity violates § 8(a)(3).") (citation omitted); NLRB v. Gen. Fabrications Corp., 222 F.3d 218, 225-27 (6th Cir. 2000) (concluding that substantial evidence supported the NLRB's finding that an employer violated § 8(a)(3) in light of the timing of the termination, a manager's false testimony about the reason for terminating the employee, and the anti-union animus shown by the employer) (citation omitted); Sam's Club v. NLRB, 141 F.3d 653, 655, 661-62 (6th Cir. 1998) (granting request for enforcement of NLRB decision finding that an employer violated the NLRA where substantial evidence suggested that it disciplined an employee for circulating a petition about a wage grievance and distributing NLRB informational pamphlets to her co-workers); W.F. Bolin Co., 70 F.3d at 871 (stating that "disparate treatment of certain employees compared to other

employees with similar work records or offenses" and an employer's deviation from past practices in discharging an employee support an inference of discriminatory motivation); E.I. DuPont De Nemours, 750 F.2d at 529-30 (considering an employer's disparate treatment of an employee compared to its treatment of other employees as a relevant factor in finding that substantial evidence supported the NLRB's finding that the employer discharged the employee in retaliation for his union activities).   Therefore, Petitioner has satisfied its burden of showing reasonable cause to believe that OHL violated Section 8(a)(3) by warning and discharging Renal Dotson.   By doing so, it has also established reasonable cause to believe that OHL's treatment of Renal Dotson produced a derivative violation of Section 8(a)(1).   See Temp-Masters, 460 F.3d at 689.

Petitioner has offered evidence that, in a weekly report for the week ending August 17, 2009, Human Resources Manager Van Young discussed "presumed union activity" and reported that Carolyn Jones was one of the presumed chairs of the union drive. (ALJ Carson Decision 16; Ex. 92, at 1.)   Carolyn Jones was issued a warning on August 28, 2009, for refusing to follow a supervisor's instruction to go to the back of the metal detector line after an alarm went off despite following the instruction. (See ALJ Carson Decision 26-29; Ex. P, at 119-28.)   At the hearing before ALJ Carson, OHL presented no evidence that any

employee other than Carolyn Jones had been disciplined for an incident at the metal detectors. (See ALJ Carson Decision 28.) After Carolyn Jones protested that the discipline was unfair, remarking that her supervisors were ganging up on her and accusing them of trying to do to her the same thing they had done to Renal Dotson, she was suspended for five days for being disrespectful, despite OHL's having tolerated another employee calling a supervisor a "damned liar" in a pay dispute. (See id. at 28-30; Ex. P, at 120-37, 280-81.)

Those facts are consistent with and support Petitioner's legal theory that OHL violated Section 8(a)(3) by suspending Carolyn Jones to discourage support for the Union. (See Petitioner's Am. Mem. 7.) They suggest that OHL identified her as a leading union supporter, gave her a written warning for a false reason, and suspended her for conduct it tolerated from other employees because she was a leading union supporter. Given the evidence suggesting that OHL's reasons for disciplining Carolyn Jones were pretextual and that OHL's true reason for disciplining her was that she was a leading supporter of the Union, Petitioner's theory is substantial and not frivolous. See Consol. Biscuit Co., 301 F. App'x at 421-423; Ahearn, 351 F.3d at 237-38; Gen. Fabrications Corp., 222 F.3d at 227; Sam's Club, 141 F.3d at 655, 661-62; W.F. Bolin Co., 70 F.3d at 871; E.I. DuPont De Nemours, 750 F.2d at 529-30; see

34

also <u>Beverly Health & Rehab. Servs., Inc. v. NLRB</u>, 297 F.3d 468, 483 (6th Cir. 2002) (finding substantial evidence in the record to support the NLRB's finding that an employer violated § 8(a)(1) by suspending an employee because she engaged in protected union activities). Therefore, Petitioner has satisfied its burden of showing reasonable cause to believe that OHL violated Section 8(a)(3) by warning and suspending Carolyn Jones. By doing so, it has also established reasonable cause to believe that OHL's treatment of her produced a derivative violation of Section 8(a)(1). See <u>Temp-Masters</u>, 460 F.3d at 689.

Petitioner has offered evidence that, in a weekly report for the week ending August 17, 2009, Human Resources Manager Van Young discussed "presumed union activity" and reported that Jerry Smith was one of the presumed chairs of the union drive. (ALJ Carson Decision 16; Ex. 92, at 1.) On August 28, 2009, Jerry Smith was purportedly terminated for saying, "What's the problem?" when he saw Carolyn Jones, his girlfriend, crying on the other side of a fence, a comment overheard by Area Manager Phil Smith. (<u>See</u> ALJ Carson Decision 30-32; Ex. P, at 131, 212, 227-35.) A security guard who was on duty nearby sat at her desk throughout the exchange and did not intervene. (Ex. P, at 228-30.) Area Manager Phil Smith claims to have felt threatened by Jerry Smith's comment, although he claims not to have felt

threatened by employee Dwight Beard's walking to within twelve inches of him, calling him a "damned liar," and threatening "to get my money." (See ALJ Carson Decision 32; Ex. P, at 280-84, 1261.)

Those facts are consistent with and support Petitioner's legal theory that OHL violated Section 8(a)(3) by terminating Jerry Smith to discourage support for the Union. (See Petitioner's Am. Mem. 7-9.) They suggest that OHL identified him as a leading union supporter, misrepresented its reason for terminating him, and treated him more harshly than other employees because he was a leading union supporter. Given the evidence suggesting that OHL's reason for terminating Jerry Smith was pretextual and that OHL's true reason for terminating him was that he was a leading supporter of the Union, Petitioner's theory is substantial and not frivolous. See Consol. Biscuit Co., 301 F. App'x at 421-423; Ahearn, 351 F.3d at 237-38; Gen. Fabrications Corp., 222 F.3d at 227; Sam's Club, 141 F.3d at 655, 661-62; W.F. Bolin Co., 70 F.3d at 871; E.I. DuPont De Nemours, 750 F.2d at 529-30. Therefore, Petitioner has satisfied its burden of showing reasonable cause to believe that OHL violated Section 8(a)(3) by terminating Jerry Smith. By doing so, it has also established reasonable cause to believe that OHL's treatment of him produced a derivative violation of Section 8(a)(1). See Temp-Masters, 460 F.3d at 689.

Petitioner has offered evidence that, at 9:30 a.m. on March 1, 2010, Manager Buddy Lowery told employee Glorina Kurtycz, "You are on my list" and asked her what she thought about the Union. (See ALJ West Decision 59-60; Tr. 171-72, July 14, 2010.) Kurtycz told Lowery that she supported the Union and complained about working conditions as Lowery took notes. (See ALJ West Decision 59-60; Tr. 171-72, July 14, 2010.) Around 2:00 p.m. that day, Manager Vania Washington called Kurtycz to her office and accused her of handing out pro-union literature inside the warehouse and forcing employees to sign union cards. (See ALJ West Decision 68; Tr. 173-74, 181-82, July 14, 2010.) Although Kurtycz denied the accusations, she was sent home and was told to call the next day. (See Tr. 174-75, July 14, 2010.) After clocking out at 2:45 p.m., Kurtycz saw Jerry Smith distributing pro-union flyers outside OHL's facility and joined him. (See ALJ West Decision 68; Tr. 174-76, 182, July 14, 2010.) Before then, Kurtycz had never distributed pro-union flyers. (See Tr. 174-76, July 14, 2010.) Area Manger Phil Smith saw her distributing flyers. (See id. at 176-77.) The next day, Kurtycz was terminated for purportedly violating OHL's non-solicitation policy. (See ALJ West Decision 68; Tr. 173-78, July 14, 2010.)

Those facts are consistent with and support Petitioner's legal theory that OHL violated Section 8(a)(3) by terminating

Glorina Kurtycz to discourage support for the Union. (See Petitioner's Am. Mem. 12-13.) They suggest that, soon after OHL learned she was a union supporter, it terminated her for a pretextual reason. Given the evidence suggesting that OHL's reason for terminating her was pretextual and that its true reasons were that she supported the Union and distributed pro-union flyers, Petitioner's theory is substantial and not frivolous. See Consol. Biscuit Co., 301 F. App'x at 421-423; Ahearn, 351 F.3d at 237-38; Gen. Fabrications Corp., 222 F.3d at 227; Sam's Club, 141 F.3d at 655, 661-62; W.F. Bolin Co., 70 F.3d at 871. Therefore, Petitioner has satisfied its burden of showing reasonable cause to believe that OHL violated Section 8(a)(3) by terminating her. By doing so, it has also established reasonable cause to believe that OHL's treatment of her produced a derivative violation of Section 8(a)(1). See Temp-Masters, 460 F.3d at 689.

Petitioner has offered evidence that, on November 17, 2009, Glenora Rayford received a telephone call from Roy Ewing, the manager of the Remington Department where Rayford had regularly worked two hours of overtime on an as-needed basis since May 2009. (See ALJ West Decision 58-59; Tr. 295-300, 309-10, July 15, 2010.) During that call, Ewing told Rayford that he did not want her to work the next day at the Remington Department because "he didn't want this Union shit down in here." (See ALJ

West Decision 58-59; Tr. 314, July 15, 2010.) Ewing then said he did not want her at the Remington Department and not to work there unless he called her. (See Tr. 315, July 15, 2010.) As of July 15, 2010, Rayford had not worked overtime at the Remington Department since that call. (See id.)

Those facts are consistent with and support Petitioner's legal theory that OHL violated Section 8(a)(3) by denying Glenora Rayford overtime at the Remington Department because it perceived her to be a supporter of the Union and wanted to discourage support for the Union. (See Petitioner's Am. Mem. 11-12.) They suggest that OHL discriminated against Rayford by denying her opportunities to work overtime at the Remington Department. Given the evidence, Petitioner's theory is substantial and not frivolous. See NLRB v. Homer D. Bronson Co., 273 F. App'x 32, 38 (2d Cir. 2008); Marathon LeTourneau Co. v. NLRB, 699 F.2d 248, 254-55 (5th Cir. 1983). Therefore, Petitioner has satisfied its burden of showing reasonable cause to believe that OHL violated Section 8(a)(3) by denying overtime opportunities to Rayford. By doing so, it has also established reasonable cause to believe that OHL's treatment of Rayford produced a derivative violation of Section 8(a)(1). See Temp-Masters, 460 F.3d at 689.

Petitioner has demonstrated that the legal theory underlying the allegations of unfair labor practices by OHL are

"substantial and not frivolous." <u>Ahearn</u>, 351 F.3d at 237 (quoting <u>W. Mich. Plumbing & Heating</u>, 250 F.3d at 969). The facts of this case are consistent with Petitioner's legal theory. <u>See id.</u> Petitioner has "present[ed] enough evidence in support of its coherent legal theory to permit a rational factfinder, considering the evidence in the light most favorable to [Petitioner], to rule in favor of [Petitioner]." <u>ADT Sec. Servs., Inc.</u>, 379 F. App'x at 486 (quoting <u>S. Lichtenberg & Co.</u>, 952 F.2d at 371). Therefore, Petitioner has made the showing required for this Court to conclude that that there is reasonable cause to believe that OHL has engaged in unfair labor practices. <u>See id.</u>; <u>Ahearn</u>, 351 F.3d at 237.

**B.  Just and Proper**

The "just and proper" element turns primarily on whether a temporary injunction is necessary to protect the NLRB's remedial powers under the NLRA. <u>Ahearn</u>, 351 F.3d at 239 (citing <u>Detroit Newspaper Agency</u>, 154 F.3d at 279). The relief to be granted must be "[o]nly that reasonably necessary to preserve the ultimate remedial power of the Board" and must not "be a substitute for the exercise of that power." <u>Id.</u> (quoting <u>Detroit Newspaper Agency</u>, 154 F.3d at 279).

The court "must determine whether 'it is in the public interest to grant the injunction, so as to effectuate the policies of the National Labor Relations Act or to fulfill the

remedial function of the Board.'"   W. Mich. Plumbing & Heating,
250 F.3d at 970 (quoting Nixon Detroit Diesel, 859 F.2d at 30).
To determine whether injunctive relief is "just and proper," the
legal standard the court "must apply is whether such relief is
'necessary to return the parties to status quo pending the
Board's proceedings in order to protect the Board's remedial
powers under the NLRA, and whether achieving status quo is
possible.'"   United Paperworkers Int'l Union, 965 F.2d at 1410
(quoting Frankel, 818 F.2d at 495); accord Calatrello ex rel.
NLRB v. Automatic Sprinkler Corp. of Am., 55 F.3d 208, 214 (6th
Cir. 1995).   The "status quo" is "that which existed before the
charged unfair labor practices took place . . . ."   Nixon
Detroit Diesel, 859 F.2d at 30 n.3; accord Automatic Sprinker
Corp. of Am., 55 F.3d at 214.   Therefore, "[i]nterim judicial
relief is warranted whenever 'the circumstances of a case create
a reasonable apprehension that the efficacy of the Board's final
order may be nullified, or the administrative procedures will be
rendered meaningless.'"   Sheeran v. Am. Commercial Lines, Inc.
683 F.2d 970, 979 (6th Cir. 1982) (quoting Angle v. Sacks ex
rel. NLRB, 382 F.2d 655, 660 (10th Cir. 1967)); see also Detroit
Newspaper Agency, 154 F.3d at 279 ("Where the Board's remedial
powers would be ineffective without a court order temporarily
returning the protagonists to the positions they occupied before

41

occurrence of the alleged unfair labor practice, the district court normally has discretion to issue such an order.").

Petitioner requests that this Court direct OHL to cease and desist certain acts and conduct that violate the NLRA. (See Pet. 12-14.) Petitioner also requests that this Court direct OHL to take certain affirmative action, including temporarily reinstating Renal Dotson, Jerry Smith, and Glorina Kurtycz to their former positions or substantially equivalent positions; temporarily expunging the discipline issued to Renal Dotson and Carolyn Jones; temporarily allowing Glenora Rayford to resume working overtime in the Remington Department when work is available; and posting copies of this Court's order. (See id. at 14-15.)

Petitioner argues that, without an injunction, any relief ultimately ordered by the NLRB would be futile because the time between OHL's unlawful employment practices and any relief ordered by the NLRB would irreparably harm employees' support for the Union. (See Petitioner's Am. Mem. 16-20.) Petitioner has offered evidence that OHL has committed numerous unlawful employment practices that have chilled employees' support for the Union and exercise of rights protected by the NLRA. As discussed above, substantial evidence suggests that OHL violated the NLRA on numerous occasions during the election campaign. In the union election, the Union had 144 signed cards from

42

employees expressing a desire for union representation, but received only 119 votes in its favor. (See, e.g. id. at 16; Ex. W, at 1-3, ECF No. 19-4.) ALJ West has recommended that the results of the election be set aside because OHL's conduct prevented a fair election. (See ALJ West Decision 93, 95.) The number of employees on the Union's organizing committee has declined because seven employees no longer attend meetings and refuse to accept union literature. (See Petitioner's Am. Mem. 16.) Some of those employees have indicated they no longer support the Union. (See id.) The rate at which the Union obtained authorization card signatures greatly declined after the Union filed the election petition. (See id. at 16-17.) Employees are afraid to exercise their protected rights and to support the Union because of OHL's conduct. (See, e.g., id. at 16-20; Ex. V, ECF No. 19-4; Ex. W.) ALJ Carson and ALJ West have ordered OHL to provide substantially identical relief to the relief sought by Petitioner in this case. (See ALJ Carson Decision 36-37; ALJ West Decision 93-97.)

In light of Petitioner's evidence suggesting pervasive unlawful employment practices, granting an injunction is in the public interest to effectuate the policies of the NLRA and to protect the NLRB's remedial powers. See Ahearn, 351 F.3d at 239; W. Mich. Plumbing & Heating, 250 F.3d at 970. Injunctive relief is necessary to return the parties to status quo pending

the NLRB's proceedings in order to protect the NLRB's remedial powers under the NLRA.  See United Paperworkers Int'l Union, 965 F.2d at 1410.  The status quo in the relationship between OHL and employees in this case is May 2009 when union organizational activity began and before any unlawful conduct occurred.  See Automatic Sprinker Corp. of Am., 55 F.3d at 214; Nixon Detroit Diesel, 859 F.2d at 30 n.3.  Achieving that status quo is possible by granting the injunctive relief Petitioner requests.  See Automatic Sprinkler Corp. of Am., 55 F.3d at 214; United Paperworkers Int'l Union, 965 F.2d at 1410.  The circumstances of this case create a reasonable apprehension that the efficacy of the NLRB's final order may be nullified and the administrative procedures will be rendered meaningless by OHL's conduct.  See Am. Commercial Lines, Inc. 683 F.2d at 979.  The NLRB's remedial powers would be ineffective without an order from this Court temporarily returning OHL, its employees, and the Union to the positions they occupied before the alleged unfair labor practices began.  See Detroit Newspaper Agency, 154 F.3d at 279.

The cease and desist order requested by Petitioner is appropriate under the circumstances to prevent irreparable chilling of support for the Union among employees and to protect the NLRB's remedial powers.  See Lineback v. Spurlino Materials, LLC, 546 F.3d 491, 500 (7th Cir. 2008) ("The longer that an

employer is able to chill union participation . . . the less likely it is that the union will be able to organize and to represent employees effectively once the NLRB issues its final order.") (citations omitted); W. Mich. Plumbing & Heating, 250 F.3d at 970-71 (affirming district court's order enjoining discrimination against employees who engage in union activities based on the district court's conclusion that the effects of the employer's unfair labor practices would linger without such an order and employees' ability to exercise their rights to join a union would be chilled if such an order were not issued); Heartland-Univ. of Livonia, 632 F. Supp. 2d at 672-74 (concluding that injunctive relief was just and proper where the petitioner had presented evidence that injunctive relief was necessary to prevent erosion of support for a union among employees); Ahearn ex rel. NLRB v. Audubon Reg'l Med. Ctr., 937 F. Supp. 617, 630 (W.D. Ky. 1996) (ordering an employer to cease and desist practices that discouraged union support and employees' exercise of protected rights); Bordone v. Talsol Corp., 799 F. Supp. 796, 801-02 (S.D. Ohio 1992) (ordering an employer to cease and desist actions to intimidate and punish employees for supporting unionization pending final disposition by the NLRB); Gottfried ex rel. NLRB v. Purity Sys., Inc., 707 F. Supp. 296, 302-04 (W.D. Mich. 1988) (stating that courts have found a cease and desist order to be just and proper "where, as

45

here, there is reasonable cause to believe that the effects of unfair labor practices linger" and ordering an employer to cease and desist activities in violation of § 8(a)(1) and § 8(a)(3) (citation omitted).

The affirmative relief Petitioner requests is also appropriate under the exceptional circumstances presented by this case for the same reasons. See Overstreet *ex rel.* NLRB v. El Paso Disposal, L.P., 625 F.3d 844, 856 (5th Cir. 2010) ("In exceptional cases . . . the district court may employ an injunction ordering reinstatement, so as to prevent the destruction of employee interest in collective bargaining, irreparable injury to the union's bargaining power, and the undermining of the effectiveness of any resolution through the Board's process.") (citation omitted); Ahearn, 351 F.3d at 239 (affirming district court's order finding that interim reinstatement for three employees was just and proper because evidence suggested that their terminations chilled union activity, causing employees to fear reprisals for union activities); W. Mich. Plumbing & Heating, 250 F.3d at 971 (affirming district court's order finding that reinstatement of a leading union organizer to his former position was just and proper because his absence could irreparably harm the union's chances of organizing the employees); Pye *ex rel.* NLRB v. Excel Case Ready, 238 F.3d 69, 74-75 (1st Cir. 2001) (stating that the

discharge of active, open union supporters risks a serious adverse impact on employee support of unionization and that "[t]he absence of key union organizers can contribute to the erosion of support for a nascent union movement") (citations omitted); <u>Purity Sys.</u>, 707 F. Supp. at 304 (ordering an employer to reinstate three employees to return the work force to status quo and decrease the risk of "serious adverse employee interest in unionization" and to post copies of the court's order at its facility).   Because there is reasonable cause to believe that OHL's activities were designed to discourage union support, it is appropriate to return the parties to status quo to counter the effects of those activities.   <u>See</u> <u>Frankel</u>, 818 F.2d at 496 (concluding that reinstatement of union members by the district court was just and proper).   Therefore, this Court finds that the injunctive relief requested by Petitioner is just and proper.   <u>See</u> <u>Ahearn</u>, 351 F.3d at 239.

OHL argues that injunctive relief is not just and proper because of Petitioner's delay in seeking injunctive relief. (<u>See</u> OHL Mem. 16-18.)   Delay is a permissible consideration, especially when the harm has already occurred and the parties cannot be returned to status quo.   <u>See</u> <u>Frankel</u>, 818 F.2d at 495. However, the Sixth Circuit has explained:

> [W]e find no authority for the proposition that
> district courts are <u>required</u> to consider the delay in
> filing a section 10(j) petition, or that a failure to

> consider the delay is a proper basis for overturning
> the grant of injunctive relief.  Rather than requiring
> a consideration of the number of days or months which
> have passed between the issuance of a complaint and
> the seeking of section 10(j) relief, we believe the
> appropriate focus is on whether it is necessary to
> return the parties to status quo pending the Board's
> proceedings in order to protect the Board's remedial
> powers under the NLRA, and whether achieving status
> quo is possible.

Id.  For the reasons discussed above, it is necessary to return

the parties to the status quo to protect the NLRB's remedial

powers and achieving the status quo is possible.  Petitioner's

delay in filing the Petition is also less than periods

considered reasonable in other cases.  See, e.g., Heartland-

Univ. of Livonia, 632 F. Supp. 2d at 674-75.  The Court accepts

Petitioner's explanation that the delay was reasonable given

OHL's ongoing conduct and the administrative processes in place

to investigate and authorize § 10(j) injunction requests.  (See

Petitioner's Am. Mem. 19-20; Petitioner's Reply Br. 3-5.)

## V.   Conclusion

For the foregoing reasons, there is reasonable cause to

believe that OHL has engaged in unfair labor practices and that

the injunctive relief requested by Petitioner is just and

proper.  See Ahearn, 351 F.3d at 234-37 (citations omitted).

Therefore, the Petition is GRANTED.

The Court ORDERS OHL, its officers, representatives,

supervisors, agents, employees, and all persons acting on its

behalf or in participation with it, to cease and desist from the following acts and conduct, pending the final disposition of the matters involved herein by the Board:

(a) Coercively interrogating employees about their union activities or sympathies and the union activities of other employees;

(b) Threatening employees with loss of the gain share program and other benefits if they select the Union as their collective bargaining representative;

(c) Telling employees who support the Union that they should find another job;

(d) Confiscating pro-union literature from break rooms prior to the ending of breaks;

(e) Threatening that it would be futile for employees to select the Union as their collective bargaining representative;

(f) Threatening employees with loss of their jobs if they participate in an economic strike;

(g) Contacting the police to have Union agents removed from public property;

(h) Interfering with employees' right to distribute literature to their fellow employees in nonworking areas on nonworking time;

(i) Prohibiting employees from engaging in lawful solicitation and distribution at a location of the company at which they do not work;

(j) Soliciting employees to encourage other employees to abandon their support for the Union;

(k) Telling employees that they are no longer allowed to work with other employees because of the employees' union activities and sympathies;

(l) Threatening employees with unspecified reprisals if employees discuss with other employees their conversations with supervisors concerning the employees' union activities;

(m) Warning, suspending, and discharging employees, and refusing to allow employees to work overtime or otherwise discriminating against employees because of their union activities in support of the Union; and

(n) Interfering, restraining or coercing employees in the exercise of their rights guaranteed by Section 7 of the NLRA.

This Court also ORDERS OHL, its officers, representatives, supervisors, agents, employees, and all persons acting on its behalf or in participation with it, to take the following affirmative actions necessary to effectuate the policies of the NLRA pending the final disposition of the matters involved herein by the NLRB:

(a) Within ten (10) days of the issuance of this Court's Order, offer Renal Dotson, Jerry Smith, and Glorina Kurtycz full reinstatement to their former jobs or, if those jobs no longer exist or have been filled, to substantially equivalent positions, without prejudice to their seniority or any other rights or privileges previously enjoyed;

(b) Within ten (10) days of the issuance of this Court's Order, temporarily expunge the discipline issued to Renal Dotson on August 3, 2009, and the discipline issued to Carolyn Jones on August 28, 2009, and not to rely on those disciplinary actions in issuing any future discipline;

(c) Within ten (10) days of the issuance of this Court's Order, allow Glenora Rayford to resume working overtime in the Remington account when work is available;

(d) Post copies of the Conclusion of this Court's Order, together with a Spanish translation prepared at OHL's expense and approved by Petitioner, at OHL's Memphis, Tennessee facilities where notices to employees are customarily posted; maintain those postings during the NLRB's administrative proceedings free from all obstructions and defacements; grant agents of the NLRB reasonable access to OHL's facilities to monitor compliance with this posting requirement; and

(e) Within twenty (20) days of the issuance of this Court's Order, file with the Court, with a copy sent to Petitioner, a

sworn affidavit from a responsible official of OHL setting forth with specificity the manner in which OHL has complied with the terms of this Order, including how the documents have been posted as required by this Order.

So ordered this 5th day of April, 2011.


s/ Samuel H. Mays, Jr.
SAMUEL H. MAYS, JR.
UNITED STATES DISTRICT JUDGE